[No. 3497–6–III.   Division Three.   April 23, 1981.]

ROBERT A. HANER, *Respondent,* v. QUINCY FARM
CHEMICALS, INC., *Defendant,* COLUMBIA
PRODUCERS, INC., *Appellant,* OLIN
CORPORATION, *Respondent.*

*Jerry J. Moberg* and *Ries & Kenison,* for appellant.

*Clifton W. Collins* and *Collins & Hansen,* for respondent Haner.

*E. McDuff Archibald* and *Bogle & Gates,* for respondent Olin Corp.

*Kenneth O. Eikenberry, Attorney General, Thomas L. Boeder, Senior Assistant,* and *Jon P. Ferguson* and *John R. Ellis, Assistants,* amici curiae for respondents.

GREEN, J.—This action was brought by Robert A. Haner, d/b/a Double Bar Ranch, against Quincy Farm Chemicals, Inc., for damages resulting from the purchase of defective seed wheat causing crop loss.[1] Quincy Farms denied liabil-

---

[1]Several other farmers listed in the caption joined in this action, but their claims are not involved in this appeal.

ity and filed a third party complaint against Columbia Producers, Inc., for indemnity, alleging it was merely a conduit for the seed supplied by Columbia. Columbia denied liability and filed a fourth party complaint against Olin Corporation and its distributors, McGregor & Co. and Wilbur–Ellis Co.[2] Columbia alleged the seed was contaminated by Terra–Coat, a fungicide manufactured by Olin.

The trial court found Mr. Haner's reduced yield resulted from the sale by Quincy Farms to him of seed wheat that had been negligently overtreated with Terra–Coat by its supplier, Columbia, causing it to become sterile. The court concluded Columbia breached its implied warranty of merchantability, RCW 62A.2–314, and engaged in deceptive and/or unfair acts under the Consumer Protection Act, RCW 19.86.020.[3] Mr. Haner was awarded $26,813.21 for crop loss and the cost of reseeding, $1,000 under the Consumer Protection Act, and $8,034.78 attorney's fees against Quincy Farms. Quincy Farms, in turn, was awarded a judgment for indemnity against Columbia. Columbia's fourth party complaint against Olin was dismissed and Olin recovered a judgment against Columbia for its costs and attorney's fees in the amount of $13,854.74. Columbia appeals.

---

[2]Columbia assumed the defense for Quincy Farms, and Olin assumed the defense for McGregor & Co. and Wilbur–Ellis.

[3]The dissent states Mr. Haner's action for breach of the Consumer Protection Act should be barred because no privity existed between Columbia and Haner. No authority is cited, nor have we found any, to support this proposition. Moreover, the parties did not raise this issue either at trial or on appeal. In fact, Columbia's brief, at page 6, states that, although Quincy purchased the wheat seed from Columbia and sold it to Mr. Haner, it

> never exercised control over or custody of the seed as it was delivered directly to Haner from [Columbia]. . . . [Quincy] tendered its defense in the trial court action to [Columbia] and the tender was accepted. For purposes of simplicity at trial, [Columbia] and [Quincy] were considered as the same party. . . . At trial, Columbia assumed the position of Quincy Farm Chemicals [Quincy] as a defendant in the Haner action.

Further, at trial, Columbia's counsel stipulated to liability for breach of warranties owed to Mr. Haner to the extent the seed was proved to be defective or nonmerchantable. Thus, even if privity is required, which we do not decide, or could be raised for the first time on appeal, it was waived during trial.

It is contended the trial court erred in (1) awarding damages to Mr. Haner for his crop loss; (2) finding Columbia's breach of implied warranty of merchantability was a violation of the Consumer Protection Act; and (3) awarding attorney's fees and costs to Olin. We affirm.

In the fall of 1975, Mr. Haner farmed 410 acres of land in Grant County with his son–in–law, David Kosa. The land was to be planted in wheat. Since their operation was relatively new, they sought advice as to farming practices from the extension agent, Elvin Kulp. He recommended use of McDermid seed for winter planting. They ordered the seed from Quincy Farms, a supplier of seed, fertilizers and chemicals. Quincy Farms delivered 21,000 pounds of certified McDermid seed from current inventory and ordered an additional 21,000 pounds from Columbia. That seed was taken from Columbia's "Lot 17, McDermid Common wheat seed" which was treated with Terra–Coat.[4] Mr. Haner planted the seed within two of three concentric circles according to his method of irrigation.[5]

In March, Mr. Kosa noticed the Lot 17 seed was not sprouting effectively.[6] Kosa alerted Kulp and Quincy Farms, who made an inspection and concluded the seed was largely sterile. Kosa and Kulp testified the Lot 17 seed was only sprouting every 2 to 3 feet. On Kulp's recommendation, the area planted with Lot 17 seed was reseeded with a spring variety of wheat. When the crop was cut, the reseeded area was harvested together with the other wheat.

---

[4]There is no difference between certified and common seed in terms of their growing capabilities.

[5]All of the seed was planted within circles designated as Lots 9, 10, and 11. Lot 9 was planted with the certified seed purchased from Quincy Farms. Lot 10 was planted partly with the common McDermid seed delivered by Columbia and partly with Nugaines seed, purchased from a neighbor. All of Lot 11 was planted with McDermid common from Columbia.

[6]Seed furnished by Columbia was identifiable because the Terra–Coat stained it red. This seed was distinct from the other seed supplied by Quincy Farms because that seed was stained green.

The yield was less than Mr. Haner expected.

First, Columbia contends the court erred in awarding damages to Mr. Haner because of insufficient proof. It is argued the reduced yield could have been from other causes—lack of fertile soil, negligent farming practices, or a reduced yield from the spring seed wheat. It relies on *Scott v. Rainbow Ambulance Serv., Inc.,* 75 Wn.2d 494, 452 P.2d 220 (1969); *Smith v. Rodene,* 69 Wn.2d 482, 418 P.2d 741 (1966); *Holmes v. Toothaker,* 52 Wn.2d 574, 328 P.2d 146 (1958); *Wappenstein v. Schrepel,* 19 Wn.2d 371, 142 P.2d 897 (1943). Those cases state if there is evidence of loss from several causes, only a portion of which is caused by the defendant, the evidence is too uncertain to award damages without proof of that portion. However, these cases do not apply here.

In this case, there is no evidence showing Mr. Haner's damages resulted from any other cause. Columbia stipulated "the damage, if any , . . . was a result of some defect in the seed product." The court found that conditions for planting and growing wheat were good in the fall and winter of 1975 and 1976; Messrs. Haner and Kosa continuously followed good farming practices as recommended by Kulp and those practices were proper and reasonable; the yield from the plot planted solely with certified McDermid seed supplied by Quincy Farms was good; and the spring variety of wheat used to reseed the other plots does not normally yield as heavy a crop as the winter variety. These findings are supported by substantial evidence and Columbia's argument must be rejected.

Second, it is further contended the court erred in computing damages from the yield of the entire 410 acres. Columbia claims it could only be liable for the reduced yield of the 210 acres planted with the contaminated seed. Since Mr. Haner did not harvest this area separately, the damage caused by the defective seed is speculative. We disagree.

Once the fact of damage is established, the precise amount need not be shown with mathematical certainty.

Evidence of damage is sufficient if it affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture. *Golden Gate Hop Ranch, Inc. v. Velsicol Chem. Corp.*, 66 Wn.2d 469, 403 P.2d 351 (1965); *O'Brien v. Larson*, 11 Wn. App. 52, 54, 521 P.2d 228 (1974); *Burkheimer v. Thrifty Inv. Co.*, 12 Wn. App. 924, 928, 533 P.2d 449 (1975); *Lester N. Johnson Co. v. Spokane*, 22 Wn. App. 265, 273, 588 P.2d 1214 (1978). Here, the court found Mr. Haner's land could reasonably be expected to yield 90 bushels per acre. This finding is based upon evidence that neighboring property produced more than 100 bushels per acre. There was no evidence that neighboring property was any more adaptable to growing wheat than the Haner property. Further, there was testimony that, based on lengths of combine runs required to fill Haner's hopper, the yield from the noncontaminated seed was between 94 and 104 bushels per acre. The court reasoned that had the remaining acreage been planted with good seed it would have had a similar yield. The court applied the 90–bushel yield to the 410 acres, subtracted the actual yield and concluded the difference resulted from the contaminated seed. This figure was multiplied by the prevailing market price. There is ample evidence to support this approach.

Third, Columbia contends the court erred in awarding damages under the Consumer Protection Act. The court supported the award by finding:

17. That the third party defendant Columbia Producers, Inc. treated [lot 17 wheat seed] with fungicide commencing in August of 1975 at various times to December of 1975. . . . Only one sample of wheat seed was tested by the third party defendant Columbia Producers, Inc. and this was treated seed tested in September of 1975 and the germination was 83%. . . . [I]n spite of this low germination test, Columbia Producers, Inc. labeled the seed as having a minimum of 85% germination and failed to advise any customer of Quincy Farm Chemicals, Inc. of the low germination test and failed to seek to determine the cause of the low germination.

18. That contrary to customary and required practices in seed treatment, Columbia Producers, Inc. continued to treat seed with this fungicide Terra–Coat in excessive amounts without further germination testing, [or] . . . determining the cause of seed obviously being over treated, as evidenced by visual examination at the output of the fungicide application machine, all resulting in overtreatment as much as four times recommended rates and resulting in actual tested treated seed germination rates as low as 53%.

19. That even after discovery of its overtreatment, the third party defendant did not voluntarily advise Quincy Farm Chemicals or the Plaintiff or any persons of its knowledge of overtreatment resulting in damaged seed.

20. That both Quincy Farm Chemicals, Inc., and the purchaser were entitled to rely and did rely on the expertise of the third party defendant Quincy Farm Chemicals [sic Columbia Producers] to furnish satisfactory wheat seed as required by Quincy Farm Chemicals, Inc. for sale to the purchaser.

The court also found that complaints similar to Mr. Haner's "were received from other growers who planted seed from the same lot of treated seed."

It is Columbia's position that Mr. Haner's claim arises solely from a private sale involving mere negligence or inadvertence. The court found Columbia negligent in the following respects.

21. The over–treatment of the wheat seed sold by Columbia Producers to Quincy Farm Chemicals was caused by a leak in the seed treater of Columbia Producers, Inc., causing more Terra–Coat than anticipated to be applied to the seed.

22. The leak in the seed treater was located on pipe that was found to be rusty.

23. Columbia Producers had the sole responsibility for maintaining the seed treater which contained the leak.

24. In the exercise of reasonable care, Columbia Producers should have discovered the leak prior to the sale of any Lot 17 seed that had been over–treated.

25. Columbia Producers did not have a system or procedure to determine the amount of seed treatment that it was applying.

26. In the exercise of reasonable care, Columbia Pro-

ducers should have had such a system or procedure.

27. The over–treated seed could have been determined by a visual inspection of the seed because it had a darker color than properly–treated seed.

28. Columbia Producers did not exercise reasonable care in its training of personnel with respect to looking for seed color that would indicate overtreatment.

29. The proximate cause of the plaintiff's crop loss was inferior seed which was less fertile because it was over–treated by Columbia Producers.

30. Columbia Producers knew or, in the exercise of reasonable care, should have known that the Lot 17 McDermid wheat seed was over–treated.

It is argued the public interest was not sufficiently affected by this negligent conduct to constitute a violation of the act. We disagree.

The prerequisites for an action by a private person under the Consumer Protection Act were summarized in *Anhold v. Daniels,* 94 Wn.2d 40, 45, 614 P.2d 184 (1980):

[T]he conduct complained of [must] (1) be unfair or deceptive; (2) be within the sphere of trade or commerce; and (3) impact the public interest.[7]

The public interest requirement is satisfied upon proof that

(1) the defendant by unfair or deceptive acts or practices in the conduct of trade or commerce has induced the plaintiff to act or refrain from acting; (2) the plaintiff suffers damage brought about by such action or failure to act; and (3) the defendant's deceptive acts or practices have the potential for repetition.

*Anhold v. Daniels, supra* at 46. In *Lidstrand v. Silvercrest Indus.,* 28 Wn. App. 359, 368, 623 P.2d 710 (1981), the court noted the first two elements require a causal connection between the defendant's acts and plaintiff's damages.

---

[7]These requirements are set forth in RCW 19.86.020:

"Unfair methods of competition and *unfair or deceptive acts or practices* in the conduct of any *trade* or *commerce* are hereby declared unlawful." (Italics ours.)

And, in RCW 19.86.920:

". . . this act shall not be construed to prohibit acts or practices . . . which are not injurious to the *public interest* . . ." (Italics ours.)

Evidence that others have been injured by similar deceptive practices is sufficient to establish the third element—the potential for repetition. *Anhold v. Daniels, supra; Keyes v. Bollinger,* 27 Wn. App. 755, 760, 621 P.2d 168 (1980).

All of the elements of *Anhold* are satisfied here. First, Columbia's conduct was unfair and deceptive. It delivered seed labeled as having a minimum germination rate of 85 percent when it knew or should have known from its own test the germination rate was lower. Although it was readily observable from the color of the treated seed that Columbia's seed treater was coating seed with varying amounts of Terra–Coat, no attempt was made to discover the malfunction or the reason for the low germination rate of the treated seed. Further, Columbia did not inform either Quincy Farms or Mr. Haner of its discovery that the seed would not germinate as expected but allowed them to rely upon its expertise in supplying satisfactory seed. Columbia's holding itself out as having expertise in supplying fertile seed induced farmers in the area to purchase its seed. There is clearly a causal connection between Mr. Haner's damages and the fact that the seed was neither as fertile as represented nor fit for its intended use.[8] Further, since Columbia was a seed wheat supplier, its conduct occurred in trade or commerce.

Finally, Columbia's conduct impacts the public interest. The findings reflect that Columbia's actions did not amount to a single act of negligence, affecting only one person, but recurred and affected many farmers who purchased its seed. Complaints had been received by Columbia from other farmers who had germination problems similar to Mr. Haner's. In fact, subsequent tests of seed treated by Columbia showed overtreatment of as much as four times the manufacturer's recommended rate, resulting in a ger-

---

[8]Elvin Kulp testified that prior to sale, farmers should be advised if seed has a germination rate of less than 85 percent. One farmer testified that he would never buy any seed with a germination rate of less than 85 percent. In addition, we note that an 85 percent germination rate is the minimum acceptable figure for state certified seed. WAC 16–316–550.

mination rate as low as 53 percent.

Columbia's contention that mere negligence or inadvertence was involved is of no aid to its position. Intent is not required under the act. RCW 19.86.090; *Fisher v. World–Wide Trophy Outfitters*, 15 Wn. App. 742, 551 P.2d 1398 (1976); *Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wn. App. 39, 554 P.2d 349, 83 A.L.R.3d 680 (1976). All that is required is that its conduct have a capacity or tendency to deceive. *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 317, 553 P.2d 423 (1976). Columbia held itself out as a seed wheat supplier with expertise in treating and supplying fertile seed. At a minimum, the conduct here had the capacity or tendency to deceive because both Quincy Farms and Mr. Haner had a right to expect that the wheat seed supplied by Columbia would be fertile. In light of the foregoing, the Consumer Protection Act was properly applied to Mr. Haner's claim and comports with the liberal construction to be accorded the act.[9] *Aungst v. Roberts Constr. Co.*, 95 Wn.2d 439, 442, 625 P.2d 167 (1981).

Finally, Columbia contends the court erred in awarding attorney's fees and costs to Olin. The attorney's fees were granted on the basis that Olin would not have incurred such expense but for Columbia's sole and active negligence. Columbia argues that before attorney's fees can be granted on this theory, the complaint against Olin must have been brought by a third party who is not privy to the events giving rise to the indemnity claim. It is argued that since Columbia, and not Mr. Haner, brought the complaint against Olin for selling defective chemicals and Columbia was privy to those events, Olin is precluded from recovering its attorney's fees. We disagree.

Generally, a party cannot recover attorney's fees and costs incurred in litigation absent a contract, statute, or

---

[9] In view of our holding, we do not reach the issue of whether a violation of a seller's warranties under the Uniform Commercial Code, RCW 62A.2–314, is a per se violation of the Consumer Protection Act.

recognized ground of equity authorizing it. However, in *Armstrong Constr. Co. v. Thomson,* 64 Wn.2d 191, 195, 390 P.2d 976 (1964), the court stated:

> This rule governs the action between the parties to the transaction whence the cause of action arose. In those actions, where the acts or omissions of a party to an agreement or event have exposed one to litigation by third persons—that is, to suit by persons not connected with the initial transaction or event—the allowance of attorney's fees may be a proper element of consequential damages.

*See also Wells v. Aetna Ins. Co.,* 60 Wn.2d 880, 376 P.2d 644 (1962); *Vincent v. Parkland Light & Power Co.,* 5 Wn. App. 684, 491 P.2d 692 (1971); *Koch v. Seattle,* 9 Wn. App. 580, 513 P.2d 573 (1973); *Manning v. Loidhamer,* 13 Wn. App. 766, 538 P.2d 136 (1975); *Wilber v. Western Properties,* 22 Wn. App. 458, 589 P.2d 1273 (1979). To recover attorney's fees under the latter rule, it must be shown that the party has become involved in a legal dispute with a third party because of the defendant's tortious acts or breach of contract. The court in *Manning, supra* at page 769, stated three elements are necessary to create such liability:

> (1) a wrongful act or omission by A toward B; (2) such act or omission exposes or involves B in litigation with C; and (3) C was not connected with the initial transaction or event, *viz.,* the wrongful act or omission of A toward B.

Here, Olin's involvement in litigation arose from Columbia's negligent overtreatment of seed wheat with Terra-Coat, contrary to the rate recommended by Olin, the manufacturer. As a result of Columbia's negligent overtreatment, an action was brought by Mr. Haner and Olin was forced to incur expenses defending itself against Columbia's claim for indemnity. Mr. Haner, the third party here, was not privy to Olin's sale of fungicide to Columbia. Recovery should not depend upon who brought Olin into the action. "It is the object and purpose of our liberal rules of joinder to encourage the adjudication of the rights and claims of all

parties in one proceeding." *Wells, supra* at 882. As a practical matter, Olin had to establish it was not liable for the reduced yield ·of the Haner wheat crop. Olin's· expenses were occasioned by Columbia, the wrongdoer here.

Columbia cites *Armstrong Constr. Co., supra,* and *Manning v. Loidhamer, supra,* as being applicable. Those cases are not inconsistent with our holding. They stand for the proposition that the party who brings the action for attorney's fees cannot be privy to the events giving rise to the initial litigation where the attorney's fees were incurred. Here, Olin was not privy to the sale of the overtreated seed by Columbia. We, therefore, do not find them to be controlling. The court did not err in its award to Olin.

Affirmed.

McInturff, C.J., concurs.

Roe, J. (concurring in part, dissenting in part)—I concur in the amount of damages awarded arising from a breach of implied warranty of merchantability, which arose from the negligent treatment of seed wheat with a fungicide. I concur in the award of attorney's fees.

I dissent from the majority holding that the Consumer Protection Act, RCW 19.86, applies in this case; hence, I would disallow the penalties provided under that act against a third party defendant, Columbia Producers, Inc. It was not sued by the plaintiff. It was not in privity of contract with the plaintiff. It did not induce plaintiff to do anything in reference to the seed. Columbia's breach of warranty regarding the seed was one which arose out of its overtreatment with fungicide caused by a leak in its seed treatment machine which was fed from a rusty pipe.

As stated by the majority, the plaintiff Haner sued Quincy Farms, not Columbia Producers, Inc. The obvious reason Haner sued Quincy Farms is because Haner contracted only with Quincy Farms for the delivery of a certain amount of seed. Quincy was unable to fulfill the order and asked Columbia to produce the balance. The finding of fact

by the trial court is that it was a sale by Quincy to Haner. There is no finding of a sale by Columbia to Haner. The seed was ordered from Quincy, not from Columbia.

The effect of the majority holding is to bring within the Consumer Protection Act all sales which breach an implied warranty, even though breach of the warranty may arise from simple negligence, and to bring such person who had no privity or contact with the ultimate consumer within the sphere of the act.

A short review of some of the cases involving the application of the Consumer Protection Act in the state of Washington is in order to demonstrate the position of this dissent. In *State v. Reader's Digest Ass'n,* 81 Wn.2d 259, 501 P.2d 290 (1972), the defendant engaged in an advertising promotion called a sweepstakes. The court held this was a lottery and cited Const. art. 2, § 24, which prohibits lotteries and makes them a criminal offense; therefore, this activity was illegal, against public policy, and per se unfair. Hence, it is within the Consumer Protection Act.

In *Lightfoot v. MacDonald,* 86 Wn.2d 331, 544 P.2d 88 (1976), involving an action against an attorney for alleged negligence and breach of an agreement, plaintiff alleged the acts of the attorney were deceptive and unfair, a departure from the standard of care reasonably expected of an attorney, and sought cover under the Consumer Protection Act. As stated therein, the Consumer Protection Act was designed to protect the public from acts or practices which are injurious to consumers and not to provide an additional remedy for private wrongs which do not affect the public generally. It was held the act did not apply.

Under RCW 19.86.020, which was designed to complement the body of federal law, it was the intent of the legislature that the courts be guided by the interpretations given by the federal courts to the various federal statutes dealing with the same or similar matters. It is further stated that the intent of the legislature by this act would not be construed to private acts or practices which are not injurious to the public interest. There is no private remedy

provided in the federal act, as all enforcement is left in the hands of the Federal Trade Commission. The federal statute does not provide private persons with an administrative remedy for private wrongs and the community's interest in seeing that private rights are respected is not sufficient public interest. *Lightfoot* cited the federal cases which held it was not the purpose of the antitrust laws, the federal equivalent of our Consumer Protection Act, to furnish treble damages where there have been only the ordinary breaches of contract.

In *Salois v. Mutual of Omaha Ins. Co.*, 90 Wn.2d 355, 581 P.2d 1349 (1978), the court may have moderated *Lightfoot v. MacDonald, supra.* It was concerned with the application of the Consumer Protection Act and the post-occurrence conduct of the carrier. In deciding that the Consumer Protection Act applied, the court referred to RCW 48.01.030, which specifically states: "The business of insurance is one affected by the public interest, . . ." Since the defendant's conduct had violated this statute, it was unlawful and against public policy; thus, it constituted a per se violation of the Consumer Protection Act, RCW 19.86.020.

In *Anhold v. Daniels*, 94 Wn.2d 40, 614 P.2d 184 (1980), the plaintiff Anhold, an unemployed single woman, inexperienced in business, was approached by the defendant at a social gathering. He identified himself as specializing in business opportunities. The evidence showed Daniels and the other defendant, Munger, practiced persuading inexperienced people to invest in various types of ventures. The court referred to the holding in *Lightfoot v. MacDonald, supra,* that an act or practice of which a private individual may complain must be one which also would be vulnerable to complaint by the Attorney General under the act. Since *Lightfoot,* the court has held the Consumer Protection Act applies and a private party may bring an action under it where there is a *specific legislative declaration* that the public has an interest in the subject matter of the action, citing *Salois v. Mutual of Omaha Ins. Co., supra.* But if

there is a specific legislative declaration that the public does not have an interest, the act does not apply. *Brown v. Charlton,* 90 Wn.2d 362, 583 P.2d 1188 (1978). The statutory sections may not require a private party to demonstrate that the public interest be affected; nevertheless, under the recent cases, litigants must sustain an injury as a result of unfair or deceptive acts or practices in the conduct of any trade or commerce.

The court in *Anhold* said that the language vulnerable to complaint by the Attorney General is either too restrictive or too all–inclusive. It is too restrictive if it confines private actions to the large and egregious cases with which the Attorney General has in the past concerned himself. It is too all–inclusive if its sweep encompasses so many cases that the act becomes another remedy for virtually all private wrongs. As the majority states, *Anhold* requires an unfair or deceptive act which induced the plaintiff to act.

Under the federal act, before the Federal Trade Commission may file a complaint, the public interest must be specific and substantial. In my view that means it must not be minimal or episodic.

Here, there was no showing that there were any inducements, deceptive advertisements, sales techniques, or false representations which induced the sale. How can that requirement cover the delivery in good faith to a third person of seed for planting which, unknown to the seller, was overtreated or overcoated with a fungicide, and only in one batch through the malfunctioning of the coating machine? Like other cases, there is no showing that this happened before, that it is the practice of the defendant seller, or that it is likely to happen again. Certainly, we may assume that the defendant would make every effort to cure the malfunctioning of its seed treating equipment. Otherwise, its seed business would be destroyed. Actually, there is an action for damages, but not for the punitive aspects of the Consumer Protection Act. This was a private sale and not to plaintiff. Haner simply wanted to buy seed. The 85 percent label was never seen by Haner or relied upon by him

or Quincy. It did not figure in the sale. I also believe the difference between 83 and 85 percent is subject to the de minimis rule. It is hardly enough to call down the full panoply of consumer protection penalties, even if it were relevant in this case.

*Lidstrand v. Silvercrest Indus.,* 28 Wn. App. 359, 623 P.2d 710 (1981), cited by the majority, repeats the test that a Consumer Protection Act claim may be based on a per se violation of a statute or on a deceptive practice unregulated by statute but involving the public interest, and held that the act did not apply for a breach of warranty in the sale of a mobile home. This is the precise status of the facts in the case at bench and supports this dissent.

Breach of the implied warranty of merchantability is not in the same category as unfair insurance practices statutes, antilottery statutes, or unfair motor vehicle practices statutes. *See Salois v. Mutual of Omaha Ins. Co., supra; State v. Reader's Digest Ass'n, supra; Dempsey v. Joe Pignataro Chevrolet, Inc.,* 22 Wn. App. 384, 589 P.2d 1265 (1979). I have found no cases which apply the per se test to a breach of an implied warranty of merchantability of all goods sold in commerce where the damage arises out of simple negligence. I do not think a simple act of negligence in a sale is affected with a public interest.

If the Consumer Protection Act is to apply in every case where there has been a misstatement, or every sale in which there has been a breach of warranty, or negligence, or the most minimal misrepresentation, even when there is no broad public interest, then every sale would become a consumer protection case. Such an interpretation can transfer almost all sales lawsuits into that category. I do not believe the act was intended to produce such a result, or that it would be a wise economic policy.

An interesting question is presented in the award of attorney's fees to the chemical manufacturer, Olin, against the distributor who overtreated the seed, Columbia Producers. The plaintiff did not sue the manufacturer. Had this been an action between Columbia and Olin, no attor-

ney's fees would lie in Olin's favor. But when Columbia joined Olin as an additional party defendant and exposed it to the charges and burdens of Haner's lawsuit, attorney's fees should lie under the principle of *Armstrong Constr. Co. v. Thomson,* 64 Wn.2d 191, 390 P.2d 976 (1964). Haner did not seek to burden Olin with litigation, but Columbia pushed Olin into the line of fire. For this, Columbia should pay.

Reconsideration denied June 16, 1981.

Review granted by Supreme Court September 25, 1981.